UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SANDRA MARGARET DUTTON          :
                                :
          Plaintiff             :     No. 4:10-CV-2594
                                :
     vs.                        :     (Complaint Filed 12/21/10)
                                :
MICHAEL ASTRUE,                 :
COMMISSIONER OF SOCIAL          :     (Judge Munley)
SOCIAL SECURITY,                :
                                :
          Defendant             :

<u>MEMORANDUM AND ORDER</u>

<u>Background</u>

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Sandra Margaret Dutton's claim for social
security disability insurance benefits and supplemental security
income benefits.  For the reasons set forth below we will remand
the case to the Commissioner for further proceedings.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It
is undisputed that Dutton met the insured status requirements of
the Social Security Act through September 30, 2010. Tr. 13 and

15.[1]  In order to establish entitlement to disability insurance benefits Dutton was required to establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Dutton was born in the United States on March 20, 1961. Tr. 93 and 113.  Dutton graduated from high school in 1979 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 32, 119 and 125. Dutton held several jobs which can be considered past relevant employment.[2]  From 1979 to 1999 Dutton worked as a bookbinder, described by a vocational expert as semi-skilled, light work; from 2000 to 2003 Dutton worked as a waitress and bartender,

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on February 24, 2011.

2. Past relevant employment in the present case means work performed by Dutton during the 15 years prior to the date her claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

described as unskilled, light work; and from 2004 to 2008 as a
teacher's aide, described as semi-skilled, light work, and as a
janitor, described as semi-skilled, medium work.[3] Tr. 57 and 128.

3. The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

(a) *Sedentary work*. Sedentary work involves lifting no
more than 10 pounds at a time and occasionally lifting
or carrying articles like docket files, ledgers, and
small tools.  Although a sedentary job is defined as
one which involves sitting, a certain amount of walking
and standing is often necessary in carrying out job
duties.  Jobs are sedentary if walking and standing are
required occasionally and other sedentary criteria are
met.

(b) *Light work*.  Light work involves lifting no more
than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is
in this category when it requires a good deal of
walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg
controls.  To be considered capable of performing a
full or wide range of light work, you must have the
ability to do substantially all of these activities.
If someone can do light work, we determine that he or
she can also do sedentary work, unless there are
additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no
more than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds.  If
someone can do medium work, we determine that he or she
can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more
than 100 pounds at a time with frequent lifting or
carrying of objects weighing up to 50 pounds. If
someone can do heavy work, we determine that he or she
can also do medium, light, and sedentary work.

Records of the Social Security Administration reveal that Dutton had reported earnings from January, 1979 through 2001, and 2004 through the first two quarters of 2008, as follows:

| | |
|---|---|
| 1979 | $  3547.12 |
| 1980 | 9262.73 |
| 1981 | 9974.92 |
| 1982 | 12389.15 |
| 1983 | 13376.23 |
| 1984 | 14449.84 |
| 1985 | 15547.68 |
| 1986 | 15111.51 |
| 1987 | 16707.95 |
| 1988 | 16157.27 |
| 1989 | 18207.53 |
| 1990 | 15844.90 |
| 1991 | 16796.64 |
| 1992 | 19681.36 |
| 1993 | 22475.57 |
| 1994 | 13452.87 |
| 1995 | 16604.57 |
| 1996 | 19104.20 |
| 1997 | 25878.31 |
| 1998 | 29981.35 |
| 1999 | 8019.32 |
| 2000 | 9678.92 |
| 2001 | 11242.57 |
| | |
| 2004 | 968.76 |
| 2005 | 12308.93 |
| 2006 | 10295.08 |
| 2007 | 9717.81 |
| 2008 | 2100.00 |

Tr. 112.  No earnings are reported for the years 2002 and 2003. Id.  Dutton's total earnings from 1979 through 2008, a period of

_____

20 C.F.R. §§ 404.1567 and 416.967.

4

thirty years, were $388,883.09. Id.

Dutton claims that she became disabled on February 28,

2008, as a result of back, neck and right leg pain, obesity,

fibromyalgia,[4] sleep apnea, depression and anxiety. Tr. 29, 66, 70,

4. Fibromyalgia is described by the American College of
Rheumatology in pertinent part as follows:

> Fibromyalgia is an often misunderstood – even
> unrecognized – disorder that causes widespread muscle
> pain and tenderness which tends to come and go, and
> move about the body.  This common and chronic condition
> also can be associated with fatigue and sleep
> disturbances.
>
> Fast facts
>
> • Fibromyalgia affects 2-4% of the population,
> predominantly women.
>
> • Fibromyalgia is diagnosed based on patient
> symptoms and physical examination. There is no
> laboratory, radiographic, or other diagnostic
> test, but these can be used to exclude other
> conditions.
>
> *    *    *    *    *    *    *    *    *    *
>
> What is fibromyalgia?
>
> Fibromyalgia is defined by chronic widespread muscular
> pain and symptoms such as fatigue, sleep disturbance,
> stiffness, cognitive and memory problems, and symptoms
> of depression and anxiety. More localized pain
> conditions often occur in patients with fibromyalgia,
> including migraine or tension headaches,
> temporomandibular disorder, irritable bowel syndrome,
> gastroesophageal reflux disorder, irritable bladder,
> and pelvic pain syndrome. The symptoms of fibromyalgia
> and associated conditions can vary in intensity and
> wax and wane over time. Stress often worsens these
> symptoms.
>
> *    *    *    *    *    *    *    *    *    *    *

120 and 182.   Dutton contends that she has abnormalities in the cervical and lumbar regions of her spine which cause chronic pain and difficulty walking and sitting for prolonged periods of time. Id.  A function report completed by Dutton which outlines some of

---

American College of Rheumatology, Practice Management, Fibromyalgia, http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromyalgia.asp (Last accessed January 25, 2012).  Also, "it is often the rheumatologist who makes the diagnosis (and rules out other rheumatic diseases), but [the] primary care physician can provide all the care and treatment for fibromyalgia . . . ." Id.

        The Mayo Clinic website sets forth the criteria for diagnosing fibromyalgia as follows:

        Tests and diagnosis

        In 1990, the American College of Rheumatology (ACR) established two criteria for the diagnosis of fibromyalgia:

        ▪ Widespread pain lasting at least 3 months

        ▪ At least 11 positive tender points—out of a total possible of 18

        But fibromyalgia symptoms can come and go.  And many doctors were uncertain about how much pressure to apply during a tender point exam. While the 1990 guidelines may still be used by researchers studying fibromyalgia, less stringent guidelines have been developed for doctors to use in general practice.  These newer diagnostic criteria include:

        ▪ Widespread pain lasting at least three months

        ▪ No other underlying condition that might be causing the pain

Fibromyalgia, Tests and diagnosis, Mayo Clinic staff, http://www.mayoclinic.com/health/fibromyalgia/DS00079/DSECTION=tests-and-diagnosis (Last accessed January 25, 2012).

6

her daily activities reveals that Dutton claims that she can perform some chores and other duties throughout the day but that she has to rest periodically. Tr. 135-136.  She alleges that she has to a use a three-pronged cane or walker to ambulate and that she takes narcotic pain medications which cause side effects and only partially relieve her pain. Tr. 16 and 35-45.  Dutton has not been employed since February 28, 2008.

Dutton alleges that she was originally injured in a motor vehicle accident in 1999 and that the pain resulting from that accident only became unbearable in the first half of 2008. Tr. 144 and 182.

A medical record from December, 2002, states that Dutton "was abusing alcohol" and "had a DUI in October, 2001," which involved a motor vehicle accident in which Dutton sustained a broken right collar bone (clavicle) and that Dutton "has occasional pain with weather change, but no other lasting problems from that." Tr. 291.  That medical record also states that Dutton "stopped drinking entirely" as a result of the DUI. Id.

A medical record of July 7, 2004, reveals that Dutton was the victim of spousal abuse. Tr. 290.  Dutton "was hit across the left eye, choked and pushed" and "received sutures in the emergency room over her left eye." Id.  A physical examination revealed "tenderness to palpation over the thoracic and lumbar spine and paravertebral musculature, and an area of ecchymosis [bruising] to

the distal lateral left forearm measuring 5 x 3 cm" and "multiple excoriated areas [abrasions] in her neck and middle upper back." Id.

A document entitled "Disability Report - Adult - Form SSA -3368" contained within the administrative record indicates that Dutton stopped work on February 28, 2008, because her "father needed full time care." Tr. 120.[5]  Other records reveal that Dutton's father was terminally ill with lung cancer and that he passed away in May, 2008. Tr. 180-181.

In addition to being treated for physical problems, the medical records reveal that Dutton was treated for depression and anxiety with multiple psychotropic medications, including Effexor,[6] Xanax,[7] Elavil,[8] Celexa[9] and Doxepin.[10]  Id.

---

5. It is not clear whether this document was filed by Dutton or completed by an employee of the Social Security Administration when Dutton was interviewed.

6. "Effexor (venlafaxine) is an antidepressant in a group of drugs called selective serotonin and norepinephrine reuptake inhibitors (SSNRIs). . . Effexor is used to treat major depressive disorder, anxiety, and panic disorder." Effexor, Drugs.com, http://www.drugs.com/effexor.html (Last accessed January 26, 2012).

7. "Xanax (alprazolam) belongs to a group of drugs called benzodiazepines . . . [and] is used to treat anxiety disorders, panic disorders, and anxiety caused by depression." Xanax, Drugs.com, http://www.drugs.com/xanax.html (Last accessed January 26, 2012).

8. "Elavil is in a group of drugs called tricyclic antidepressants." Elavil, Drugs.com, http://www.drugs.com/ elavil.html (Last accessed January 27, 2012).

9. Celexa, a selective serotonin reuptake inhibitor (SSRI), is an antidepressant. Celexa, Drugs.com, http://www.drugs.com/

Dutton protectively[11] filed an application for disability insurance benefits on November 4, 2008, and an application for supplemental security income benefits on November 24, 2008. Tr. 13, 64-65 and 91-102.  On March 23, 2009, the Bureau of Disability Determination[12] denied Dutton's applications. Tr. 66-74.  On April 7, 2009, Dutton requested a hearing before an administrative law judge. Tr. 75-76.  After 12 months had passed, a hearing before an administrative law judge was held on April 7, 2010. Tr. 25-62.  On May 7, 2010, the administrative law judge issued a decision denying Dutton's applications. Tr. 13-21.  On June 10, 2010, Dutton requested that the Appeals Council review the administrative law judge's decision and on October 18, 2010, the Appeals Council concluded that there was no basis upon which to grant Dutton's request for review. Tr. 1-5 and 8-9.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

---

celexa.html (Last accessed January 26, 2012).

10. Doxepin is a drug used to treat depression.  Doxepin, Drugs.com, http://www.drugs.com/pro/doxepin.html (Last accessed January 26, 2012).

11. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

12. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 66 and 71.

On December 21, 2010, Dutton filed a complaint in this court requesting that we reverse the decision of the Commissioner and award her benefits, or remand the case to the Commissioner for further proceedings.  The Commissioner filed an answer to the complaint and a copy of the administrative record on February 24, 2011.  Dutton filed her brief on May 16, 2011, and the Commissioner filed his brief on June 8, 2011.  The appeal[13] became ripe for disposition on June 20, 2011, when Dutton filed a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the

---

13. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all

the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which

12

he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for
work.  For purposes of the preceding sentence (with
respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92.  This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[14] (2) has an impairment that is severe
or a combination of impairments that is severe,[15] (3) has an

---

14. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

15. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[17]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is

---

lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

16. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

17. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Dutton's medical records.

Dutton's primary care physician was John Brinker, D.O., of Monroe Family Practice, Stroudsburg, Pennsylvania. Dr. Brinker's treatment relationship with Dutton commenced on or before September 15, 2003, and continued to at least the date of the administrative hearing.[18] Tr. 44 and 290.

On July 16, 2007, Dutton had an appointment with Dr. Brinker at which Dutton complained of anxiety and depression. Tr. 177. Dutton told Dr. Brinker that she was under stress because she was caring for both of her parents who were suffering from dementia and that she was having difficulty sleeping. Id. Dr. Brinker's assessment was that Dutton was suffering from anxiety and he prescribed Effexor and Xanax. Id. Between July 16th and October 9, 2007, Dutton's anxiety and depression were treated with Effexor and Xanax. Tr. 178.

On or about September 25, 2007, Dutton suffered a

_____

18. The record reveals that Dutton commenced treatment at Monroe Family Practice in or before January, 2000. Tr. 291. The administrative hearing as stated earlier was held on April 7, 2010. Dutton had an extended treatment relationship with Dr. Brinker.

laceration to her left hand from a broken glass while washing dishes and was treated at the emergency department of Moses Taylor Hospital, Scranton. Tr. 225-246.  The wound was closed with 9 sutures. Tr. 239.  The sutures were removed by Dr. Brinker at an appointment on October 9, 2007.[19] Tr. 178.  Dr. Brinker also was of the impression that Dutton was suffering from depression and continued treating Dutton with Effexor and Xanax. Id.  Dutton received a refill of the Xanax prescription in mid-November and an additional supply of Effexor[20] in late November, 2007. Id.

Blood testing on December 3, 2007, revealed that Dutton's cholesterol levels were above normal. Tr. 194.

At an appointment with Dr. Brinker on December 18, 2007, Dutton reported that she felt better with the Effexor and that she started taking Zocor for her high cholesterol and was "not having any problems or myalgias [muscle pain]."[21] Tr. 179.  Dr. Brinker's

---

19. The sutures were removed from the "right second digit," the index finger of the left hand. Tr. 178. Dr. Brinker's medical record of this appointment does oddly refer to both Dutton's right and left hand.  The hospital record did contain a diagram depicting Dutton's hands which reveals that the laceration was near the knuckle of the index finger on the left hand. Tr. 238.

20. It appears that Dr. Brinker was providing Dutton with samples of Effexor which he had at his office.

21. A side-effect of Zocor can be "unexplained muscle pain, tenderness, or weakness." Zocor, Drugs.com, http://www. drugs.com/zocor.html (Last accessed January 25, 2012).

assessment was that Dutton suffered from hyperlipidemia[22] and depression and he continued Dutton on Zocor and Effexor, and scheduled follow-up blood work and a follow-up appointment in 3 months. Id.

From mid-December through February, 2008, Dutton continued to take Effexor and Xanax for her depression and anxiety. Tr. 180.

Dutton's alleged disability onset date as stated earlier was February 28, 2008.

At an appointment with Dr. Brinker on March 11, 2008, Dutton stated that she was having no problems taking the Zocor but she was "concerned that the Effexor [was] not helping her." Id.   Dr. Brinker stopped the Effexor and started Dutton on Symbyax[23] and continued her on Xanax. Id.   Dr. Brinker's assessment was that Dutton suffered from anxiety, depression and hyperlipidemia, and scheduled a follow-up appointment in three months. Id.

On March 17, 2008, Dutton telephoned Dr. Brinker's office and reported that she was "very edgy" and "crying a lot." Id.   Dr.

---

22. Hyperlipidemia is the presence in the blood of abnormally high amounts of lipids (fat molecules) such as cholesterol and triglycerides.

23. "Symbyax contains a combination of fluoxetine and olanzapine. Fluoxetine is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs) Olanzapine is an antipsychotic medication. . . Symbyax is used to treat depression caused by bipolar disorder. Symbyax is also used to treat depression after at least 2 other medications have been tried without successful treatment of symptoms." Symbyax, Drugs.com, http://www.drugs.com/symbyax.html (Last accessed January 25, 2012).

Davis, an associate of Dr. Brinker, discontinued the Symbyax and started Dutton on Doxepin, an antidepressant medication. Id.

On March 25, 2008, Dutton telephoned Dr. Brinker's office and reported that the "last two meds did not help" her depression and anxiety. Tr. 181. Dr. Brinker restarted Dutton on Effexor and Xanax. Id. On May 5, 2008, Dr. Davis authorized a refill of the Xanax (Alprazolam) prescription. Id.

On June 10, 2008, Dutton had an appointment with Dr. Brinker. Id. At that appointment Dutton stated that she was "doing well on the Effexor" and the Xanax "seem[ed] to help." Id. Dr. Brinker continued Dutton on Effexor and Xanax. Id.

At an appointment with Dr. Brinker on July 16, 2008, Dutton complained of back pain that started years ago which "in the last several months" had "worsened." Tr. 182. She further stated that the pain radiated down her right leg and is "worse when she bends forward." Id. A physical examination revealed "tenderness to palpation over the lumbar paravertebral musculature." Id. Dr. Brinker's assessment was that Dutton suffered from a "lumbar strain/sprain" and "chronic low back pain." Id. Dr. Brinker ordered an MRI of the lumbar spine and prescribed Darvon.[24] Id. The diagnosis accompanying the MRI order was "Back Pain [with]

_____

24. Darvon (propoxyphene) is a narcotic pain-reliever which was withdrawn from the U.S. market by the Food and Drug Administration in 2010. Darvon, Darvocet Banned, WebMed, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (Last accessed January 25, 2012).

Radiculopathy."[25] Id.

On July 18, 2008, Dutton had an MRI of the lumbar spine conducted at Pocono MRI, East Stroudsburg. Tr. 175.  The MRI revealed (1) at the L5-S1 level mild degenerative disc disease,[26]

_____

25. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord.  They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes).  See, generally, Radiculopathy, MedicineNet. com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed January 25, 2012).  A herniated disc is one cause of radiculopathy. Id.

26. Degenerative disc disease has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic

moderate degenerative facet hypertrophy,[27] mild bilateral foraminal stenosis[28] and a small right foraminal disc herniation with right L5 nerve root encroachment; (2) multilevel degenerative spondylosis and annular bulges;[29] and (3) mild degenerative disc and facet disease at the L1 through the L5 levels. Id.

After July 18, 2008, Dutton continued to take psychotropic medications and Darvon. Tr. 182-184.

On December 9, 2008, Dutton had an appointment with Dr.

_____

disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the facet joints is also a cause of localized lumbar pain that can be detected with plain x-ray testing is also a cause of localized lumbar pain.  The pain from degenerative disc disease of the spine is usually treated conservatively with intermittent heat, rest, rehabilitative exercises, and medications to relieve pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet.com/ degenerativedisc/page2.htm (Last visited January 25, 2012). Degenerative disc disease is considered part of the normal aging process.  Id.

27. Facet hypertrophy is enlargement of the facet joint. Such enlargement can cause pressure on a nearby nerve root.

28. Foraminal stenosis is the narrowing of the opening through which nerves roots exit.

29. The intervertebral discs, the soft cushions between the bony vertebral bodies, have an outer layer called the annulus.  A bulge is where the disc (in this case the annulus of the disc) extends beyond the perimeter of the vertebral bodies.  Such bulges if they contact nerve tissue can cause pain.

Brinker at which Dutton complained of fatigue and worsening back pain. Tr. 185.  Dr. Brinker's assessment was that Dutton suffered from fatigue, anxiety, lumbar degenerative disc disease and hyperlipidemia. Tr. 186.  Dr. Brinker continued Dutton on the drugs Xanax, Vicodin,[30] Effexor and Zocor (Simvastatin). Id.  He also ordered a Thyroid Stimulating Hormone (TSH) blood test and scheduled a follow-up appointment in three months. Id.  The results of the TSH blood test were normal. Tr. 185 and 189.

On January 2, 2009, Dutton telephoned Dr. Brinker's office complaining of "terrible back pain." Tr. 276.  Dr. Davis authorized a prescription for Vicodin and Motrin which was transmitted to Dutton's pharmacy by fax. Id.  Dutton continued to take Vicodin, Xanax, Effexor,[31] and Zocor through February, 2009. Id.

On February 25, 2009, Vincent Bianca, M.D., examined Dutton on behalf of the Bureau of Disability Determination. Tr. 195-197.  The report of the examination is only three pages and Dr. Bianca did not complete a range of motion chart or a medical source

---

30. Vicodin, a combination of acetaminophen and hydrocodone, is a narcotic pain reliever.  Vicodin, Drugs.com, http://www.drugs.com /vicodin.html (Last accessed January 25, 2012).

31. Although page 276 of the administrative record does not reveal that Dutton continued taking Effexor from the notes of an appointment on March 10, 2009, at page 275, we know that Dutton continued to take Effexor through February because Dr. Brinker at the March 10th appointment directed that Dutton continue to take Effexor.

statement of Dutton's physical residual functional capacity.[32]   The report of the examination reveals that Dutton weighed 260 pounds and was 5 feet 6 ½ inches tall.[33] Tr. 196.   The report also indicates that Dutton had muscular spasm in the cervical, thoracic and lumbar regions of her spine; Dutton's muscle strength in the lower

---

32. A medical source statement of an individual's physical residual functional capacity would indicate, inter alia, the individual's ability to sit, stand, walk, lift and carry during an 8-hour work day. Such statements can be prepared by, inter alia, physicians, physician's assistants, chiropractors, nurse-practicioners, physical therapists, and family members who actually lived with or observed the functional abilities of a claimant. See 20 C.F.R. § 404.1513(a) and (d). There is a Residual Functional Capacity Assessment form in the record. Tr. 198-203.   That form, however, was completed by a non-medical social security disability adjudicator.   This court has repeatedly found such statements from non-medical disability adjudicators insufficient evidence of a claimant's residual functional capacity. See, e.g., Ulrich v. Astrue, Civil No. 09-803, slip op. at 17-18 (M.D.Pa. December 9, 2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662, slip op. at 15 (M.D. Pa. December 23, 2010)(Muir, J.); Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16 (M.D.Pa. January 11, 2011)(Muir, J.);   Peak v. Astrue, Civil No. 10-889, slip op. at 25 (M.D.Pa. January 24, 2011)(Muir, J.).

33. An individual of such height and weight has a body mass index of 41.3 and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/a dult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed September 14, 2011). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese. Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when [the person has] a BMI of 40 or more. With morbid obesity, [the person is] especially likely to have serious health problems." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. mayoclinic.com/health/obesity/DS00314 (Last accessed January 25, 2012).

extremities was decreased on the right to 4/5 and on the left to 3/5; Dutton's reflexes were normal; Dutton had a "swaggering limp to her gait and station" which was "mildly unsteady"; Dutton had "pain on palpation of the chest wall, back, lower back and thigh bilaterally consistent with fibromyalgia-type pain"; and Dutton's range of motion was "decreased in the lumbosacral spine" and "mildly decreased in the cervical region."  Tr. 196. Dr. Bianca's diagnoses, in toto, was as follows: "Multiple level arthritic and degenerative disc disease with mild C-spine decreased range of motion, muscle spasm, and LS spine disc disease with radiculopathy into the lower extremities with mild gait dysfunction, fibromyalgia and chronic pain syndrome with depression." Tr. 197.

On March 10, 2009, Dutton had an appointment with Dr. Brinker at which Dutton complained of low back pain. Tr. 276-275. Dr. Brinker's assessment was that Dutton suffered from obesity, lumbar degenerative disc disease, hyperlipidemia, anxiety and depression. Tr. 275.  Dr. Brinker started Dutton on Adipex-P, a drug used to reduce weight in obese patients;[34] discontinued her Vicodin prescription and started her on Percocet;[35] continued her on Effexor, Xanax and Zocor; and scheduled a follow-up appointment in

34. This drug is an appetite suppressant. Adipex-P, Drugs.com, http://www.drugs.com/cdi/adipex-p.html (Last accessed January 26, 2012).

35. Percocet, a combination of oxycodone and acetaminophen, is a narcotic pain reliever. Percocet, Drugs.com, http://www.drugs. com/percocet.html (Last accessed January 27, 2012).

one month.  Id.

Dutton had appointments with Dr. Brinker on April 7 and May 12, 2009. Tr. 273-275.  At both of those appointments Dutton continued to complain of back pain. Id.  Dr. Brinker continued to prescribe Percocet, Xanax, Effexor and Zocor. Id.  On May 5 and May 7, 2009, Dr. Brinker prescribed Neurontin[36] and Vicodin. Tr. 274. After the appointment on May 12, 2009, Dr. Brinker referred Dutton to a pain management specialist and for a rheumatology consultation. Id.

On June 4, 2009, Dutton had an appointment with Elizabeth Karazim-Horchos, D.O., of Northeastern Rehabilitation Associates, Scranton, for a physiatric evaluation. Tr. 309-310.  A physical examination of Dutton revealed functional motor strength in the upper and lower extremities, brisk and symmetric reflexes and negative straight leg raising, but "some discomfort to palpation over the right posterior sacroiliac sulcus," a somewhat antalgic gait, and "allodynia[37] throughout . . . with palpation of the lumbar paraspinals." Tr 310.  Dr. Karazim-Horchos's assessment was as follows: "Low back pain with diagnostic history of L5-S1 disc

36. "Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." Neurontin, Drugs.com, http://www.drugs.com/neurontin.html (Last accessed January 27, 2012).

37. Allodynia is pain resulting from a usually non-painful stimulus to normal skin.  Dorland's Illustrated Medical Dictionary, 50 (27th Ed. 1988).

herniation with some complaints of neuralgia.[38]   Intervertebral disc
degeneration with radicullitis[39] and pain in her limb, history of
cervicalagia,[40] sprain/strain of the neck." Id.   Dr. Karazim-Horchos
referred Dutton to the Pain Clinic at the Community Medical Center,
Scranton, for potential epidural steroid injections. Id.   She
further prescribed physical therapy and noted that Dutton would
"continue with medicines per her family physician." Id.

     On June 9, 2009, Dutton had an MRI of the cervical spine
which revealed "moderate degenerative disc disease of C4-5 and
spondylosis as well as diffuse disc bulge causing central spinal
canal narrowing and may be in contact with the nerve root and
causing some neural foraminal narrowing." Tr. 311.   The MRI further
revealed a mild disc bulge at the C5-6 level and a "right side
protrusion disc disease causing central canal narrowing, primarily
at the right side" at the C3-4 level. Id.   The impression of the

---

38. "Neuralgia is sharp, shocking pain that follows the path of a
nerve and is due to irritation or damage to the nerve."
Neuralgia, A.D.A.M. Medical Encyclopedia, U. S. National Library
of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002380
/http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002380/ (Last
accessed January 27, 2012).

39. Radicullitis is "inflamation of the root of a spinal nerve,
especially of that portion of the root which lies between the
spinal cord and the intervertebral canal." Dorland's Illustrated
Medical Dictionary, 1405 (27th Ed. 1988).

40. Cervicalagia is neck pain which does not radiate outward to
the arms, i.e., localized neck pain. Cervicalgia,
MedConditions.net, Dictionary of medical conditions terminology,
http://medconditions.net/cervicalgia.html (Last accessed January
27, 2012).

interpreting radiologist, David Sabbar, M.D., was as follows: "Right paracentral protrusion disc disease at C3-4 causing some central canal narrowing at the right side. Degenerative disc disease C4-5 as well as degenerative osteo-arthritic changes of C4-5 and spondylosis causing diffuse disc bulge and contact with the nerve root and causing central spinal canal narrowing.  Mild disc bulge C5-6. No spondyloslisthesis.[41]  Normal cervical spinal cord." Tr. 312.

On June 30, 2009, Dutton had an appointment with Jamshid Khademi, M.D., a pain specialist, at the Pain Clinic of the Community Medical Center, Scranton. Tr. 325.  Dr. Khademi noted that Dutton's current medications were Effexor, Zocor, Excedrin, Percocet and Vicodin.[42] Tr. 326.  A physical examination revealed "some tenderness in the cervical paraspinal area, and also the supraspinatus muscles,"[43] "tenderness over the thoracolumbar spine

---

41. "The word spondylolisthesis derives from two parts - spondylo which means spine, and listhesis which means slippage. So, a spondylolisthesis is a forward slip of one vertebra (i.e., one of the 33 bones of the spinal column) relative to another. Spondylolisthesis usually occurs towards the base of your spine in the lumbar area." Spineuniverse.com, Spondylolisthesis: Back Condition and Treatment, http://www.spineuniverse.com/conditions/ spondylolisthesis/spondylolisthesis-back-condition-treatment (Last accessed January 27, 2012).

42. A medical note in Dr. Brinker's records also indicates that Dutton during June, July and August, 2009, was prescribed Xanax (Alprazolam). Tr. 273.

43. The supraspinatus muscle runs along the top of the shoulder blade from the neck to the head of the upper arm bone (the humerus).  It holds the head of the humerus in place and is essential for the forward motion of the humerus when throwing

and the paraspinal muscles,"[44] and "tenderness over the gluteal area
and the sacroiliac joint area." Id.  It was noted that Dutton had
normal upper extremity range of motion. Id.  A straight leg raising
test was positive bilaterally.[45] Id.  Dr. Khademi's assessment was
that Dutton suffered from lumbar radiculopathy and degenerative disc
disease. Id.  Dr. Khademi injected a steroid medication (celestone)
into the epidural space at the L3-4 level of Dutton's lumbar spine.
Id.  Dutton had a second appointment with Dr. Khademi on August 7,
2009, for a second steroid injection. Tr. 324-325.  Dutton reported
temporary relief for 5 days as the result of the first steroid
injection. Id.  Dutton had a third appointment with Dr. Khademi on
August 28, 2009, for a third steroid injection. Tr. 323-324. Dutton
reported that the pain relief obtained from the second steroid
injection lasted longer than the relief resulting from the first
injection. Id.

Dr. Brinker's medical notes indicate that from August 17
to September 28, 2009, Dutton received prescriptions for Vicodin
(Hydrocodone/APAP), Relafen,[46] Effexor,  Xanax, Percocet and Elavil.

---

objects.

44. Paraspinal muscles are muscles that run essentially parallel
to the spine.

45. The straight leg raise test is done to determine whether a
patient with low back pain has an underlying herniated disc.

46. Relafen is a nonsteroidal anti-inflammatory drug used to treat
pain or inflammation caused by arthritis.  Relafen, Drugs.com,
http://www.drugs.com/relafen.html (Last accessed October 19,

Tr. 272.

On October 5, 2009, Dutton had an appointment with Dr. Davis for what appears to be Dutton's annual women's health examination. Tr. 269-272.  The notes of that examination in relevant part indicate that Dutton needed refills of Relafen, Xanax, Zocor, Neurontin and Percocet. Id.  Also, Dr. Davis concluded that Dutton suffered from depression, anxiety, chronic low back pain and obesity. Id.  There also was a discussion regarding gastric bypass surgery to address Dutton's obesity and Dr. Davis referred her to a bariatric surgeon. Id.

On October 29, 2009, Dutton had an appointment with David M. Pugliese, D.O., a rheumatologist.  Tr. 296-298.  A physical examination of Dutton by Dr. Pugliese revealed that Dutton had normal muscle strength throughout, normal reflexes and a normal gait.  Dr. Pugliese observed that Dutton had diffuse back pain and 16 out of 18 fibromyalgia tenderpoints. Id.  Dr. Pugliese's assessment was as follows: "Plaintiff is a 48 year old woman with fibromyalgia and chronic pain syndrome. She has blood testing that shows a low level of [Rheumatoid factor]. However, there is no synovitis[47] on exam and the character and distribution of her pains is not consistent with [Rheumatoid Arthritis]. . . I would recommend

_____

2011).

47. The synovial membrane is the lining of a joint and when this lining is inflamed it is referred to as synovitis.

28

that she continue to work with her pain management [doctor] for her chronic pain syndrome." Tr. 298.

On November 18, 2009, Dutton had a follow-up appointment with Dr. Karazim-Horchos. Tr. 307.  At that appointment Dutton stated that she had "been falling [and] her legs gave out on her recently" and "[s]he recently got the adjustable height rotator walker" prescribed by Dr. Karazim-Horchos. Id.  A physical examination revealed that Dutton's motor strength was functional[48] in the extremities with normal reflexes, "no straight leg raise or dorsal root tension signs," Dutton's gait was functional with the rollator walker, and her lumbar range of motion was functional but painful. Tr. 307.  Dr. Karazim-Hochos further stated that Dutton had "a lot of tenderness and anxiety" when she palpated Dutton's lower back. Id.

At the end of November, 2009, Dutton had an appointment with Lehigh Valley Bariatric Medicine, Allentown, regarding bariatric surgery in order to lose weight. Tr. 317-319.  Dutton commenced a "6 month Bariatric Surgery Preparation Program." Tr. 319.

Dr. Brinker's medical notes indicate that from October 13 to January 26, 2010, Dutton received prescriptions for Percocet,

---

48. Dr. Karazim-Horchos did not indicate what she meant by "functional."

Xanax, Celexa, Bontril (Phendimentrazine),[49] Vicodin and Oxycodone (OxyIR).[50] Tr. 268-273.

On January 18, 2010, Dutton had an appointment with Dr. Brinker at which Dutton complained of "frequent episodes of back pain radiating to her legs." Tr. 268.  Dr. Brinker's assessment was that Dutton suffered from lumbar degenerative disc disease and radiculopathy. Id.  Dr. Brinker continued Dutton's prescription for Oxycodone and encouraged Dutton to continue to pursue the weight loss surgery. Tr. 267.

On February 22, 2010, Dr. Brinker completed a document entitled "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" on behalf of Dutton. Tr. 208-210.  In that document Dr. Brinker indicated that Dutton could not meet the sitting, standing and walking requirements of full-time sedentary work and that Dutton would require a sit/stand option with respect to even part-time employment. Id.  It does appear, however, that Dr. Brinker was of the opinion that Dutton could meet the lifting and carrying requirement of sedentary work. Id.  Dr. Brinker stated that the limitations he imposed were based on Dutton's "cervical disc disease/lumbar radiculopathy that will be exacerbated[.]" Tr. 209.

_____

49. Bontril is an appetite suppressant. Bontril, Drugs.com, http://www.drugs.com/bontril.html (Last accessed January 27, 2012).

50. Oxycodone is a narcotic pain reliever similar to morphine. OxyIR, Drugs.com, http://www.drugs.com/mtm/oxyir.html (Last accessed January 27, 2012).

Dr. Brinker further stated that Dutton would have difficulty reaching overhead and could never twist, stoop or crouch during an 8-hour day. Tr. 209.

On March 8, 2010, Dutton received a epidural steroid injection at the L5-S1 level of her spine. Tr. 321. The physical examination performed on that date by Rohit Singh,M.D., revealed the following about Dutton: "She is awake, alert, and oriented times three. There is no evidence of calf muscle atrophy, hypertrophy. Reflexes are symmetrical bilaterally. [Straight leg raise] is basically negative. Heel walking, toe walking were normal. The ankle reflexes were symmetrically equal. No ankle or knee clonus, Vibration and position sense are intact." Id. Dr. Singh's impression was that Dutton suffered from "[l]ow back pain, significant degenerative disc disease and lumbar radiculopathy." Id.  Also, in December, 2009, and January, 2010, Dutton underwent sleep lab studies which revealed that she suffered from moderate obstructive sleep apnea. Tr. 247-252.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Dutton did not engage in substantial gainful work activity since February 28, 2008, the alleged onset date. Tr. 15.

At step two of the sequential evaluation process, the administrative law judge found that Dutton had the following severe

31

impairments: "discogenic and degenerative disc disease and obesity."
Tr. 15.   The administrative law judge's discussion relating to
Dutton's severe impairments focused on Dutton's lumbar degenerative
disc disease.   Although the administrative law judge mentions Dr.
Bianca's finding of muscular spasm in the cervical spine, at no
point did the administrative law judge indicate whether or not
Dutton suffered from degenerative disc disease or radiculopathy of
the cervical and lumbar spines.   Furthermore, the administrative law
judge although mentioning fibromyalgia in his decision made no
finding as to whether or not Dutton in fact suffered from that
condition.   The administrative law judge did find that Dutton's
sleep apnea, depression and anxiety were non-severe impairments.
The administrative law judge found that Dutton's sleep apnea was a
non-severe impairment because during a third sleep study in January
2010 medical personnel were able to improve her sleep efficiency and
"she had significant improvement in her moderate obstructive sleep
apnea/hypopnea syndrome." Tr. 15-16.   With regard to Dutton's
depression and anxiety, the administrative law judge found that
those conditions were non-severe impairments because Dutton "never
pursued any mental health treatment from a psychiatrist, a
psychologist, or therapist." Tr. 16.

        At step three of the sequential evaluation process the
administrative law judge found that Dutton's impairments did not
individually or in combination meet or equal a listed impairment. Tr.

16-18.

At step four of the sequential evaluation process the administrative law judge found that Dutton could not perform her past relevant work because that work would not permit the use of an ambulatory device but that Dutton had the residual functional capacity to perform a limited range of light work as defined in the regulations. Tr. 16 and 20.  Specifically, the administrative law judge found that Dutton could perform light work except

> she can never climb ramps, stairs, ladders, ropes, or scaffolds and she can never balance.  The claimant can occasionally stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold, wetness, and humidity.  The claimant is limited to occupations which could be performed with a rolling walker or a three pronged cane.

Tr. 16. In so finding the administrative law judge rejected the opinion of Dr. Brinker that Dutton could not engage in full-time sedentary work.  The administrative law judge did not point to any medical opinion regarding the physical functional abilities of Dutton that was contrary to the opinion of Dr. Brinker and supportive of the finding that Dutton could engage in light work.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Dutton had the ability to perform work as a ticket seller, counter clerk, and garment trimmer, and that there were a significant number of such jobs in the Northeastern region of Pennsylvania. Tr. 20-21.

33

The administrative record in this case is 328 pages in length and we have thoroughly reviewed that record.  Dutton argues, inter alia, that the administrative law judge erred when he failed to (1) consider Dutton's cervical disc disease and fibromyalgia when formulating Dutton's residual functional capacity and (2) appropriately consider the opinion of Dr. Brinker.  Those arguments have substantial merit.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments.  20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c).  If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.   If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must

34

be considered at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The record suggests that Dutton suffered from lumbar radiculopathy, cervical degenerative disc disease and radiculopathy, and fibromyalgia.  The failure of the administrative law judge to find the above noted conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Dutton.  The administrative law judge found that Dutton's medically determinable impairments could reasonably cause Dutton's alleged symptoms but that Dutton's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  This determination by the administrative law judge

35

was based on an incomplete and faulty analysis of all of Dutton's medically determinable impairments.

The administrative law judge rejected the opinion of a treating physician regarding the physical functional abilities of Dutton. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to

36

play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In rejecting Dr. Brinker's opinion the administrative law judge did not point to any contrary medical opinion but engaged in his own lay analysis of the medical records.  The administrative law judge failed to give an adequate reason for rejecting the opinion of Dr. Brinker.  In setting the residual functional capacity at a limited range of light work, the administrative law judge did not point to any functional assessment performed by a treating physician or a physician who reviewed the medical records.  Instead, he engaged in his own lay analysis of the bare medical records.  There is a lack of substantial evidence supporting the administrative law judge's residual functional capacity assessment and rejection of Dr. Brinker's opinion.

We recognize that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living,  medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000).  However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No

physician suggested that the activity Doak could perform was

consistent with the definition of light work set forth in the

regulations, and therefore the ALJ's conclusion that he could is not

supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As

two commentators have explained:

> Sometimes administrative law judges assert that they -
> and not physicians - have the right to make residual
> functional capacity determinations. In fact, it can
> reasonably be asserted that the ALJ has the right
> to determine whether a claimant can engage in
> sedentary, light, medium, or heavy work. The ALJ
> should not assume that physicians know the Social
> Security Administration's definitions of those
> terms. However, the underlying determination is a
> medical determination, i.e., that the claimant can
> lift five, 20, 50, or 100 pounds, and can stand for
> 30 minutes, two hours, six hours, or eight hours.
> That determination must be made by a doctor. Once
> the doctor has determined how long the claimant can
> sit, stand or walk, and how much weight the claimant
> can lift and carry, then the ALJ, with the aid of a
> vocational expert if necessary, can translate that
> medical determination into a residual functional
> capacity determination. Of course, in such a situation
> a residual functional capacity determination is merely
> a mechanical determination, because the regulations
> clearly and explicitly define the various types of
> work that can be performed by claimants, based upon
> their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law

and Procedure in Federal Courts, 287-88 (2011)(emphasis added); see

also Woodford v. Apfel, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000)("An

ALJ commits legal error when he makes a residual functional capacity

determination based on medical reports that do not specifically

explain the scope of claimant's work-related capabilities.");

Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)("The lay

evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required."). The administrative law judge cannot speculate as to a claimant's residual functional capacity but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination. Id.

In rejecting Dr. Brinker's opinion the administrative law judge stated that Dr. Brinker's opinion was "an overstatement of the claimant's impairment" and "not consistent with his own medical records and objective physical findings." Tr. 19. This was inappropriate lay analysis of the medical records.

In this case there was no assessment of the functional capabilities of Dutton from a physician which supported the administrative law judge's residual functional capacity assessment and the bare medical records and other non-medical evidence were insufficient for the administrative law judge to conclude that Dutton had the residual functional capacity to engage in a limited range of light work.

The administrative law judge relied exclusively on his lay analysis of the medical records. In light of the medical evidence that we reviewed in this memorandum, the administrative law judge failed to give an adequate reason for rejecting the opinions of Dr. Brinker.

Also, the administrative law judge in evaluating Dutton's credibility did not consider her lengthy work history.  As noted earlier in this order, Dutton has a 30-year work history.  "When a claimant has worked for a long period of time, [her] testimony about [her] work capabilities should be accorded substantial credibility." Rieder v. Apfel, 115 F.Supp.2d 496, 505 (M.D.Pa. 2000)(citing Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979)).  The administrative law judge did not give an adequate reason for discrediting Dutton's testimony.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: January   31, 2012

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SANDRA MARGARET DUTTON          :
                                :
          Plaintiff             :     No. 4:10-CV-2594
                                :
     vs.                        :     (Complaint Filed 12/21/10)
                                :
MICHAEL ASTRUE,                 :
COMMISSIONER OF SOCIAL          :     (Judge Munley)
SOCIAL SECURITY,                :
                                :
          Defendant             :

<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of Sandra Margaret Dutton and against Michael J. Astrue, Commissioner of Social Security, as set forh in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Sandra Margaret Dutton disability insurance benefits and supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing  and appropriately evaluate the medical evidence and the credibility of Sandra Margaret Dutton in accordance with the background of this order.

41

3.   The Clerk of Court shall close this case.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge

Dated: January   31, 2012